**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**UNITED STATES OF AMERICA**         :

                                                          **CRIMINAL ACTION**
                      **v.**                 :     **NO. 12-572 (GP)**

**ALEXANDRE ASTAKHOV**            :


<u>**DEFENDANT'S SUPPLEMENTAL MEMORANDUM OF LAW**</u>


**PRELIMINARY STATEMENT**

The within Supplemental Memorandum of Law is submitted in opposition to the

government's pending *Starks* motion and in support of certain supplemental findings requested

by the defendant.  A *Starks* hearing was held on July 23, 2013, with the government calling only

one witness, Special Agent Alexander Zuchman (hereinafter, "ZUCHMAN").  Although well-

before the said hearing the defendant requested of the government that the so-called undercover

"Confidential Defendant" in this case, Denis Egorov ("EGOROV"), be produced as a witness at

the hearing, the government refused to produce EGOROV, and, further, also refused to accept

service of a witness subpoena seeking his testimony at the hearing.[1]  This Honorable Court, after

conclusion of ZUCHMAN's testimony and after discussion with counsel for the parties herein,

directed that, at defense counsel's option, the hearing be continued and that EGOROV be

produced for testimony, limiting the scope of his testimony to the issue of his voluntary consent

to engage in the "consensual" electronic recording of a number of in-person and telephone

---

[1] It should be noted that "Denis Egorov" is an alias.  However, as defense counsel informed the Court at the hearing, the defense is aware of the real name of the informant.  This was learned during two conversations with the prosecutor due to inadvertent "slips of the tongue" and from a document obtained in discovery.  Confidentiality of the informant, then, is not at issue in this case.

conversations between himself and the defendant and three telephone conversations between himself and a third individual whose voice could not be identified by ZUCHMAN.  The Court permitted supplemental submissions by the parties relating to the issues raised.

## STATEMENT OF FACTS

**A.  Background**

Alexandre Astakhov (alternatively, "ASTAKHOV" and "defendant"), the only named defendant, has been charged in a two-count indictment relating to alleged violations of the Arms Export Control Act ("AECA").  Count One is a Section 371 conspiracy to export certain defense articles (three night vision devises) in violation of Title 22, United States Code, Section 2778. The second count of the indictment alleges that ASTAKHOV attempted to export and aided and abetted the attempted export of certain defense articles on the United States Munitions List (the same night vision devices) without having first obtained a license or written authorization from the Department of State for such export, in violation of Title 22, United States Code, Sections 2778(b)(2) and 2778(c); Title 18, United States Code, Section 2; and Title 22, Code of Federal Regulations 121.1, 123.1 and 127.1.  Trial of the case is scheduled to begin on September 9, 2013.

The conspiracy charge of the indictment alleges a conspiracy of *two years and nine months* in duration, taking place on or between January 1, 2010 and September 12, 2012, the day that the defendant was arrested in the instant case.  He is charged with conspiring with "Co-Conspirator #1" and others known and unknown to the government.  Recently, the prosecution has identified one Yacov Shvartsovskiy ("SHVARTSOVSKIY") as the so-called Co-Conspirator #1 (after, in apparent confusion, first identifying him as "Steve Huni" and as "Alex Kostin"), also revealing that SHVARTSOVSKIY has been indicted in the Southern District of New York

on charges relating to violations of the AECA, which charges, it appears, are not related to the charges against ASTAKHOV in the instant case.  The Count One conspiracy charge in the within case alleges that SHVARTSOVSKIY "arranged" for defense articles to be exported out of the United States to Russia in various ways, known and unknown to the government and that ASTAKHOV was SHVARTSOVSKIY's "partner."  The indictment is silent as to what those "arrangements" were or why, when, where, how and with whom they were made.   We just are informed that the devices are exported in "various ways," and, at least, some of those ways are known to the government.

Although the conspiracy is a somewhat lengthy one, based on discovery documents and defense counsel's discussions with government representatives, ASTAKHOV was, allegedly, a short-lived, newcomer to a supposed existing conspiracy that had been in existence for approximately two years and one-half years before.

**B.  Testimony at Hearing**

At the *Starks* hearing, ZUCHMAN was questioned with regard to his direct testimony by the prosecutor and, then, was cross-examined by defense counsel.  On direct examination, ZUCHMAN testified that, as of the present time, he has been with the Counter-Proliferation Investigations Unit of Homeland Security Investigations for approximately three years and with HSI for an approximate total of five years.  As was brought out in cross-examination, his investigation and arrest of EGOROV, in August of 2011, was one of his first cases.  (*See*, Transcript of Hearing, hereinafter, "Tr.," at 15).  That investigation was unrelated to the instant case.

ZUCHMAN testified during direct that he was "familiar" with the twenty-eight recorded conversations that were referenced in the government's *Starks* motion papers.  (Tr., at 5-6).

All of these conversations (in-person and telephone calls) between EGOROV and ASTAKHOV were in the Russian language, and ZUCHMAN admitted on cross-examination that he cannot understand Russian at all.  (Tr., at 20).  Indeed, he had to depend upon EGOROV telling him what had transpired in each instance and, further, used the Egorov-supplied version of events in making his official Reports of Investigation ("ROI's").  (Tr., at 43-44, 49).  The agent stated too, during direct and cross, that four of the twenty-eight recordings were of face-to-face meetings between EGOROV and the defendant, where EGOROV was wearing a body wire device to transmit and record, and twenty-four were recordings of telephone conversations, three of which, the government prosecutor alleged in his motion papers, were conversations between EGOROV and SHVARTSOVSKIY and the remainder of the telephone recordings were between the defendant and EGOROV.[2]  Additionally, ZUCHMAN testified that of the twenty-four recorded telephone conversations, EGOROV recorded *eighteen* of those "on his own," with a recording device provided by ZUCHMAN but without any government agent being present.  That is, EGOROV was *unsupervised* in recording *seventy-five percent* of the recorded calls.  There was no agent present even to observe these calls.  We do not know specifically, after hearing, which six of the twenty-four calls were made and recorded with agents present and, *we do not know if EGOROV elected not to record any of the telephone conversations that he had with the defendant when EGOROV was on his own.*  (Tr., at 6, 20).  EGOROV was left free to pick his

---

[2] It should be noted that in discovery, the government, at first, provided transcripts of only four in-person, body wire recorded conversations and one recorded telephone conversation--that of August 2, 2012, informing defense counsel that those were the recordings that would be used by the government at trial.  (Tr., at 33).  Then, counsel learned that there were twenty-three more recorded telephone conversations and requested them.  It was at this point in time that the government decided to have these telephone conversations transcribed.  Defense counsel received these transcripts of telephone recordings in several stages, most between mid-June and mid-July, 2013.  (Tr., at 33).  Obviously, ZUCHMAN did not have access to these twenty-three telephone conversation translations when he composed his ROI's and when he swore to the four affidavits involved in this investigation (of June 7, 2012, regarding the application for search warrants for the emails of Hunter Perry and Alex Kostin; of July 24, 2012, regarding the application for search warrants for the emails of ASTAKHOV and Alex Kostin; of September 12, 2012, an affidavit submitted in support of the criminal complaint in this case; and of September 13, 2012, an affidavit regarding the application  to search the records of two mobile phone numbers and 2 GPS devices).  The agent had to rely on what EGOROV told him had transpired during the said twenty-three telephone conversations.

spots when it came to recording telephone conversations, independently of government agents' supervision.  Indeed, a review of the transcripts of the telephone conversations shows that he initiated most of the calls involving ASTAKHOV as a participant.  EGOROV was given clear opportunity to "set up" ASTAKHOV.  Remarkably, with regard to telephone conversations, we are left, eventually, to rely on the word, integrity and good faith of EGOROV, whose main objective (and only apparent reason for cooperating) was to make cases for the government in a desperate effort to help himself with regard to the severe potential sentence that he was facing.[3] In fact, when ZUCHMAN is asked on direct by the prosecutor, "Did Mr. Egorov record all of the calls between himself and Mr. Astakhov?," ZUCHMAN's response is not a direct one.  He cannot directly answer because ZUCHMAN has no way of knowing the answer to that question. One is left to surmise and speculation with regard to whether there were unrecorded telephone conversations and what could have been said in any such conversations.  Defense counsel was denied the opportunity to test EGOROV in cross-examination.

As indicated above, three of the recorded telephone calls were alleged, in the government's motion papers, to be between EGOROV and SHVARTSOVSKIY, who was not produced by the government as a hearing witness and who, it appears likely, will not be called as a witness by the government at the trial of this case.  These conversations took place on April 6, April 18 and May 2, 2012 and are of relatively short duration.  When ZUCHMAN is asked on direct examination if some of the recorded telephone calls "… were between Mr. Egorov and Mr. Shvartsovskiy…," the agent replies, "Yes, I *believe* so." (Emphasis added).  Apparently, ZUCHMAN is unsure or has no specific knowledge.  On cross, ZUCHMAN makes it very clear that he cannot identify SHVARTSOVSKIY's voice.  He is asked, "Oh, so you didn't recognize

---

[3] It is noted that, according to information supplied to the defense by the government, the government did not obtain permission to use a pen register (and, presumably, a trap and trace) device regarding ASTAKHOV's cell phone until June 12, 2012.

his [SHVARTSOVSKIY's] voice?"  In response, he states, "No, I've never spoken to him in my life." (Tr., at 32).  ZUCHMAN also confirms that the translators would not recognize SHVARTSOVSKIY's voice either.  No opportunity was provided to inquire whether EGOROV could identify the voice on the three telephone conversations set out above.

The transcripts of the translated recordings present an unusual scenario.  In this case, since the recordings are in the Russian language, the transcripts themselves could become the substantive evidence of the contents of the recordings—so the transcripts become more than the usual aid or guide to jurors in following what they hear on the recordings.  The original four body wire recorded conversations were translated by three different translators.  The June 7, 2012 conversation was translated and transcribed by someone employed by a private company called Para-Plus.  (Tr., at 37).  No date of transcription has been given to the defense.  The conversation of July 19, 2012 was translated by Victoria Kim, as was the conversation of August 7, 2012 (the only transcript received by defense counsel that included a certification, and that sets forth a transcription date of August 17) and the translation of the September 12, 2012 conversation was done by an Alla Grafman.  There were three different translators used, up to this point, for four body wire recordings.  (Tr., at 34-37).  These are four of the transcripts that the government seeks to authenticate and that are referenced in the government's *Starks* motion.  They were never offered as exhibits at the hearing (and no recording or transcript was so offered).  As it turns out, the government recently has retained yet another translator, one Tatiana Hay.  (Tr., at 12-13, 36-37).  She is, apparently, in the process of re-doing or revising the original four transcripts described above, so, a fourth translator is now involved with the said four conversations—in an effort to be, as the agent claimed in his testimony, "thorough" (Tr., at 36) and, also, "… *to insure that the translations were accurate*."  (Tr., at 13).   It is to be noted that

defense counsel received one "revised" copy of a transcript, that of the September 12, 2012 conversation, with revisions by Ms. Hay appearing in red print, and this was received the day before (July 23, 2013) the within hearing.  (Tr., at 36, 37-38).  The final version of these transcripts, it seems, is still a work in progress.  (Tr., at 53).  At any rate, these "revised" transcripts referred to by ZUCHMAN were not finalized, completed or available *at the time of the hearing*.

In addition to the foregoing, the twenty-four transcripts of the telephone conversations are being reviewed and revised by Ms. Hay, as well.  (Tr., at 36-37).  At the least, there is confusion as to whom (and how many translators) it was who did the original translations of these recorded conversations, transcripts of which were only received by defense counsel between mid-June and mid-July, 2013.  No revised transcripts of those conversations have been provided to the defense thus far.  Counsel for the defense has been notified in writing that *once completed*, copies of *all* final transcripts will be given to counsel.  To date, that has not occurred.  Yet, by its motion, the government contends that the transcripts in this case are ready to be or actually have been authenticated.  To the contrary, the transcripts are not even in such a state so that counsel for the parties can form a basis to attempt to stipulate to their accuracy, and defense counsel has not been asked to so stipulate.[4]

Due to the fact that ZUCHMAN does not understand Russian, he cannot compare the transcripts to what he heard being said at the in-person conversations and during the six telephone conversations for which he was present.  He cannot, on that basis, speak for their

---

[4] To date, and subsequent to the hearing, counsel for the defense also has been provided with a revised copy of the transcript of the conversation of July 19, 2012, with revisions in red print to distinguish it from the original transcript given, and *two pages* of revisions for the original eleven-page August 7, 2012 transcript. The two-page document is not in transcript form.  And, as pointed out above, no revised copies of the twenty-four telephone conversation transcripts have been provided.  This, however, does not mean that there are no revisions to these transcripts; counsel has been informed that they are still in the process of being completed.

accuracy.  Further, as to the transcripts of the telephone conversations of April 6, April 16 and

May 2, 2012, as stated, *supra*, he cannot identify the voice of the person that the government

claims in its motion papers, without setting forth a basis therefor, is SHVARTSOVSKIY.

ZUCHMAN testified on direct that EGOROV did "freely consent" to make and record

"these calls," referring, at most, to certain recorded *telephone* calls.  (Tr., at 11-12).  Nowhere in

his direct is any testimony given that EGOROV voluntarily or freely consented to recording the

four in-person (body wire) conversations, and on cross-examination, ZUCHMAN testifies that

EGOROV never filled out a form indicating that he consented to the wearing of a body wire.

(Tr., at 43).  This is an apparent omission on the part of the government and a resultant failure to

establish that EGOROV consented to the body recordings.

On cross-examination, ZUCHMAN admitted that most of the conversation that

EGOROV had with ASTAKHOV took the form of EGOROV asking questions of the defendant.

Essentially, ASTAKHOV was being "grilled" by Egorov, who became an interrogator.  The

questions and statements offered by EGOROV in these conversations were based on instructions

given by ZUCHMAN to his undercover confidential defendant.  (Tr., at 44-46).  In effect,

EGOROV, for these purposes, became ZUCHMAN's alter ego.

ZUCHMAN admitted also that there were a large number of "inaudibles" on the body

wire recordings.  For example, the recording of the conversation of July 19, 2012 (the transcript

of which is double-spaced and consists of approximately eleven pages) contained twenty-nine

occasions of inaudibility, six of which related to EGOROV and twenty-three of which related to

ASTAKHOV.  The recording of the conversation of August 7, 2012 (the transcript of which is

double-spaced and is also about eleven pages long) contained sixty occasions of inaudibility;

eleven relating to EGOROV and forty-nine relating to the defendant.

ZUCHMAN testified, as well, that once the digital body wire or telephone recordings were collected by him, he took the digital recordings to his HSI office and downloaded them onto a "secure" server.  That download was then preserved as the evidence.  (Tr., at 9, 26-27).  However, no account is given for what happened to the original digital recordings made directly from the recorder devices in the field.  The government never demonstrated that those direct recordings, the ones that show the starts and stops and the respective openings of new sound tracks for each new start, are still preserved.  In fact, the recordings given to defense counsel and to the translators were made from that which was downloaded onto the server.  (Tr., at 9, 27).

In cross-examination of ZUCHMAN that was directed to the issue of EGOROV's voluntary consent, one without any inducement,[5] ZUCHMAN stated that he was able to convince EGOROV to cooperate with the government immediately after his arrest.  (Tr., at 39).  The agent testified also about the proffer agreement ("Guilty Plea Agreement" of September 19, 2011) that was entered into between EGOROV and the government.  That agreement set forth the total maximum sentence that EGOROV was facing:  forty-five years imprisonment, a $2,225,000.00 fine and three years supervised release—as well as deportation to Russia.  It also provided that cooperation could continue after his sentence, that it was up to the government to determine if EGOROV lived up to his agreement and to make all decisions relating thereto.  EGOROV was further informed that if the government believed that his cooperation was good enough, he would get what is commonly known as a "5K1.1 letter" which, of course, could cause him to get a lesser sentence and that, since EGOROV wanted to remain in the United States, the government prosecutor could communicate with Immigration Services on his behalf to avoid deportation.  (Tr., at 40-42).

---

[5] In his direct examination testimony, short shrift was made of the issue of EGOROV's "consent."  ZUCHMAN was simply asked, "When Mr. Egorov made these calls, did he freely consent to make these particular calls and record these calls?"  ZUCHMAN replied, "Yes, he did," and that was the end of the matter.

## ARGUMENT

**I.      The Government Has Not Established a Sufficient Foundation for the Admission of the Recorded Conversations Set Out in Its *Starks* Motion.**

In *Starks v. United States*, 515 F.2d 112, 121 (3d Cir. 1975) (quoting *United States v. Knohl*, 379 F.2d 427, 440 (2d Cir. 1967)), the Third Circuit Court of Appeals placed the burden upon the government to authenticate and demonstrate the accuracy of any recorded conversations that it may seek to introduce or make use of at trial by clear and convincing evidence and articulated the following factors necessary to establish sufficient foundation for the admissibility of such recordings:

1.   The recording device used was capable of accurately recording the conversations;

2.   The operator of the recording device was competent;

3.   The recordings are authentic and correct;

4.   There have been no changes in, additions to, or deletions from the recordings;

5.   The recordings have been properly preserved;

6.   The speakers on the recordings are properly identified;

7.   The conversations were lawfully intercepted through the consent of one of the parties to the conversations and that the consent was given and the conversations elicited were made voluntarily and in good faith, without any kind of inducement.

*8.*   The transcripts of the recordings accurately represent the English language translation of the conversations on the recordings and accurately identify the speakers and parties to the recorded conversations.  (*Starks*, 515 F.2d, at 121, n. 11.  *See, also*, *United States v. Desiderio Disla Estevez*, No. _____, 2013 U.S. Dist LEXIS _____ (Pratter, J.)

10

(E.D.Pa. 2013); *United States v. Savage, et al.*, No. 07-550-03, 2013 U.S. Dist. LEXIS 14327 (E.D.Pa. Feb. 4, 2013)).

The defendant takes issue with regard to the admissibility of the twenty-eight recordings referred to in the government's *Stark*s motion papers and submits that the government has not met its burden of establishing a sufficient foundation.   The factors will be addressed in the above order.   To begin with, and as pointed out, *supra*, under "Testimony at Hearing," with regard to 18 of the 24 recorded telephone conversations, EGOROV was left on his own, unsupervised by anyone.   Beyond the fact that this left him free to choose not to record certain telephone conversations that he may have had with ASTAKHOV, it was not demonstrated sufficiently at the hearing held that EGOROV was competent to operate the device given to him to make these recordings.   ZUCHMAN testified as to his own experience and facility in operating the "Saul Mineroff SRS digital recorder (Tr., at 22)[6] but did not set forth EGOROV's experience or facility with the device.   ZUCHMAN simply acknowledged that he showed EGOROV how to use the device and acknowledged that EGOROV "seem[ed] to understand how to use that device."   (Tr., at 7-8).

No proof was offered at the hearing to demonstrate that the recordings are authentic and correct.   Perhaps, that is because the recorded conversations are all in Russian, and it will be, if they are found to be admissible at trial, the transcripts of the translations that will become the substantive evidence.   *United States v. Salvo*, 34 F.3d 1204, 1220 (3d Cir. 1994).   It is submitted, however, that no testimony or proof was adduced at the hearing to show that the transcripts are authentic and correct.   In truth, nothing has been submitted to show their accuracy.   First of all, the only person who testified was ZUCHMAN.   As demonstrated, *supra*, not only was he

---

[6] It is interesting to note that when making inquiry of Michael Mineroff, one of the owners of Saul Mineroff, Inc, located in Elmont, New York, defense counsel's investigator was informed by Mr. Mineroff that the company does not carry a digital recorder with a designation, "SRS."

relatively new to the Counter-Proliferation Investigations Unit (having approximately two years experience with the unit when he arrested ASTAKHOV), ZUCHMAN could not speak or understand the Russian language.  Therefore, he had no way to match up the recordings or the transcripts with the ten (six telephone conversations and the four body wire conversations) of the twenty-eight recorded conversations for which he was present and that he heard.  Further, no transcripts were offered/presented at the hearing.

Additionally, twenty-three of the twenty-four recorded telephone conversations were translated and transcribed between mid-June and mid-July, 2013, when copies of the transcripts were turned over to defense counsel, at the request of the defense.  These recent vintage transcripts are, apparently, being revised, as set forth above, this time by an "expert" translator, Tatiana Hay.  (Tr., at 12-13, 36-37, 53-54).  Revisions or new translations are being done, even as we write, as already stated above, "to insure that the translations were accurate."  (Tr., at 13).  It follows, then, that accuracy of the transcripts remains an issue.  This can be shown even more pointedly with regard to the four body wire conversations transcripts.  As was made clear, *supra*, initially, three different translators were used to produce four transcripts.  One day before the hearing, defense counsel received a revision of the transcript of the conversation of September 12, 2013.  Days after the hearing, counsel received copies of revisions to the transcripts of the conversations of July 19, 2013 and August 7, 2013—and was informed that these are not yet the "final" versions.  One could rightly say that the transcripts are in a state of "flux."  The fact is, revisions have been, and are being, made by Ms. Hay.  Defense counsel has been given two pages of revisions (not a final transcript) with regard to the eleven-page transcript of the August 7 transcript alone.

Finally, in this regard, especially as to the transcripts of the July 19 and August 7, there are many portions of the conversations that are inaudible. This adds to the argument that they are not accurate. As set out above, each of those two transcripts is approximately eleven pages in length. The July 19 transcript shows a total of twenty-nine occasions of inaudibility and the August 7 transcript contains sixty.

Also based on what is set out in the "Testimony of Hearing" section of the within Memorandum, the defendant submits that it can be argued that the recordings have not been shown to be properly preserved. That is, with respect to the *original* direct recordings made via the body wire device at the time of the in-person conversations and made via the telephone recorder device at the time of the various telephone conversations, the government has not shown that those recordings are still intact or that they are anywhere to be found. Testimony was given by ZUCHMAN going only to the fact that he downloaded these recordings to a "secure server" at his HSI office. In addition, while ZUCHMAN stated that the original recording devices would show starts and stops in the recording by opening a new track with each new start, no testimony was given that such would be shown on the downloaded server—and we know from ZUCHMAN's testimony that, as to the telephone recordings made by EGOROV on his own, there were multiple starts and stops. (Tr., at 24-25). The government, at the least, should have offered some proof that the original recordings exist and that what was downloaded to the server shows all of the starts and stops (tracks) of the originals. To establish preservation and a proper chain of custody of evidence, the government must demonstrate that the evidence is in substantially the same condition as when it was originally seized or obtained. *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir. 1981); *United States v. Clark*, 425 F.2d 827, 833 (3d Cir. 1970).

Next, we come to whether the speakers on the recordings are properly identified.  As to the recordings of April 6, 18 and May 2, 2012, between EGOROV and another person (not the defendant), the government sets forth in its *Starks* motion that this other person is SHARTSOVSKIY.  (It was not shown at the hearing that ZUCHMAN was present during these telephone conversations).  ZUCHMAN, however, testified that he cannot identify SHARTSOVSKIY's voice, and nothing is submitted by the government to identify the other speaker in the said conversations.  There is no basis for a reasonable jury to be convinced, even under the lesser preponderance of the evidence standard (which, as will be set forth, *infra*, the defense believes is not the standard to be employed), that SHVARTSOVSIY is the speaker.[7]

The defense maintains, too, that it was not established at the hearing that EGOROV's consent to record the subject conversations was given voluntarily and in good faith, without any kind of inducement.  First of all, at the hearing, as set forth hereinabove, testimony in this regard was elicited *only* as to EGOROV's "consent" relating to recorded telephone conversations, *not* the four in-person (body wire) recordings.  (Tr., at 11-12)  It is urged, therefore, that since the government offered nothing in this regard, and, so, has failed to meet its burden to demonstrate EGOROV's proper consent to the four in-person recorded conversations, those conversations are not admissible.

As to the remaining recorded conversations, all that the government does in this respect is to ask one question.  The prosecutor asks, "When Mr. Egorov made these calls, did he freely consent to make these particular calls and record these calls?"  ZUCHMAN responds with a simple, "Yes, he did," and that ends the matter as far as the government is concerned.  (Tr., at

---

[7] The further fact of the matter is that ZUCHMAN did not give clear-cut testimony that he could identify ASTAKHOV as a speaker in any of the recorded conversations.  It was an area that was not given much attention at the hearing.  Of course, ZUCHMAN was not present during eighteen of the recorded conversations--no government agent was.

11-12).  Nothing more is said or offered in this regard.  For the *Starks* decision to have any meaning, and for the hearing to be more than perfunctory, it is submitted most respectfully, more must be required of the government in a case like the instant one.  (Significantly, the government did not obtain, and, so, could not produce, consent forms signed by EGOROV relating to his consent to the telephone recordings or to the body wire recordings.  Based on counsel's experience, such forms are often employed by the government in like situations).  Determining whether a person's consent to the recording of his conversations is "voluntary" is not a simple task.  Consent is not voluntary where it is coerced by either explicit or implicit means or by implied threat or covert force.  Consent will be considered voluntary if, from the totality of the circumstances, the court determines that the party agreeing to recording his conversations did so consciously, freely and independently and not as the result of an overbearing of his will.  *United States v. Kelly*, 708 F.2d 121 (3d Cir. 1983); *Culombe v. Connecticut*, 367 U.S. 568, 604-605, 81 S. Ct. 1860, 1880 (1961). (opinion of Frankfurter, J.).

The totality of the circumstances of each case should be considered in determining the consent issue, for what is one person's truly voluntary consent is another's coerced or improperly induced "consent."  No one is in a better position than the individual, in this case, EGOROV, whose consent is under scrutiny, to address the issue.  In the instant case, we have EGOROV facing a potentially very severe sentence, facing deportation and being arrested for the first time.  He "immediately," upon being Mirandized by Zuchman, agrees to become a "cooperating defendant" for the government.  (Tr., at 39).  He makes this decision before he can consult with an attorney and, seemingly, before he can give it much thought and, thereby, relinquishes a bucketful of rights, perhaps, in a state of panic—or, at the least, as a reflex action.  Under the circumstances, one only can wonder if EGOROV felt that he had the option or opportunity even

to give the decision more consideration.  He appears to have been a man "on the edge."
ZUCHMAN's testimony on the subject and, especially, his demeanor on the witness stand when
defense counsel asked, "Did you try to get him to flip, to use the vernacular?," and he gave the
answer, "I Mirandized him, and he cooperated immediately," gave one the impression that
EGOROV's cooperation was instantaneous and without meaningful thought.  Once EGOROV
committed, and made admissions, the defense suggests, there was no turning back; he had gone
too far.

More regarding the issue and concept of "consent," "voluntariness" and "without any
inducement" is set forth, *supra*, at pp. 9-10.

The last factor set forth above (at p. 11) to be considered in establishing a foundation for
the admissibility at issue herein is whether the transcripts of the recordings accurately represent
the English language translation of the conversations on the recordings and accurately identify
the speakers and parties to the recorded conversations.  This subject has been covered in
discussion of some of the other *Starks* factors and, so, this writer will seek to avoid unnecessary
repetition.  Since the transcripts themselves, as stated above, would constitute the substantive
evidence because the recordings are in Russian, much more and much closer scrutiny, it is
respectfully submitted, must be given to the transcripts, if indeed, it can be determined exactly
which transcripts the government seeks to have pass *Starks* muster.  There are serious issues, as
demonstrated previously, with regard to the accuracy of the transcripts (as exemplified by the
multiple translations, especially of the body wire conversations, the contemporaneous and
ongoing revisions and transcriptions so that the government can "insure" their accuracy, the
frequency of inaudible portions, the fact that the agent who testified lacked the capacity to
compare any of the transcripts with what he heard at the time of the recordings, etc,) and with

regard to identity of a speaker in at least three of the transcribed recordings (of April 6, 18 and May 2, 2012).

Under all of the circumstances and facts set forth above, the government has not established a foundation for the admissibility of the recordings or the transcripts.

## II.    The Standard of Proof in Establishing Each of the Starks Factors Is by Clear and Convincing Evidence.

There is no question that the *Starks* Court held that the foundation factors for admissibility of recorded conversations, or as in the case at bar, transcripts of recorded conversations, must be established by clear and convincing evidence.  Over the years, there has been some uncertainty as to whether Congress' adoption of Rule 901 of the Federal Rules of Evidence abrogated *Starks*.  Rule 901(a) provides as follows:  "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Although Rule 901 went into effect on July 1, 1975, it was enacted on January 2, 1975.  *Starks* was decided on April 21, 1975.  It is submitted that it is safe to presume that the *Starks* Court was well-aware of pending Federal Rule 901 when it wrote its decision.  Beyond that, the Third Circuit has had numerous opportunities to abrogate Starks, and it has not.  In one of the latest such cases, *United States v. Toler*, 444 F. App'x 561, 564, n. 4 (3d Cir. 2011),  where the government argued that Rule 901 was applicable, the Court opined that it "… need not comment on the relationship between *Starks* and Rule 901" because the government had satisfied the higher *Starks* standard.  Then, more recently, in *United States v. Adames*, ___ F.3d ___ (No. 11-4287) (3d Cir. 2013), the court appears to cite, with approval, the "clear and convincing" standard and does not treat that standard as a thing of the past, in light of Rule 901.

In the absence of more direct guidance from the Third Circuit, some judges in the federal districts of Pennsylvania have continued to apply the higher standard of proof, while others have held the government to the lesser standard of the said Rule.  *See*, *United States v. Ureste-Meza*, No. 12-96, 2012 WL 5334590, at 5 (M.D.Pa. 2012) (listing cases addressing conflict between *Starks* and Rule 901).  While counsel's research (including of decisions in the Eastern, Middle and Western Districts) cannot be said to be anywhere approaching exhaustive or constituting an accounting of most of the relevant cases decided in the federal districts of Pennsylvania so as to provide a statistical basis, it does appear that more judges elect to apply the higher standard, perhaps, as the more cautious route to take.  It must be added, however, that in most of the decisions found employing the higher standard, the government was held to have met that standard.  That, it is respectfully submitted, is not true in the instant case.

In any event, should this Honorable Court decide that Rule 901 is applicable, the defendant contends that the government still has not met its evidentiary burden.  The defense contends that the prosecution must show that there has been "substantial evidence" presented from which it can be inferred that the transcripts are authentic, and the government has not done so.  *See, United States v. Reilly*, 33 F.3d 1396, 1404 (3d Cir. 1994).

III.     **The Confrontation Clause of the Sixth Amendment Applies to a *Starks* Hearing and the Defense Should Have Had the Opportunity to Cross-Examine Egorov.**

A.     The Confrontation Clause of the Sixth Amendment guarantees that "in all *criminal prosecutions*, the accused shall enjoy the right…to be confronted with the witnesses against him."  (Emphasis supplied).  It is submitted that the foregoing is addressed not solely to trials but to any criminal proceeding in which factual resolutions are in issue that can be outcome determinative.  The *Starks* hearing resembles and relates to the full trial in almost every

important particular.  For example, evidence is presented by means of live testimony, witnesses are sworn, and those witnesses are subject to cross-examination.  Determination of the ultimate issue depends upon the trier of fact's evaluation of the evidence, and credibility is often crucial.  Each side has incentive to prevail, with the result that the role of publicity as a testimonial safeguard, as a mechanism to encourage parties, the witnesses and the court to a strict conscientiousness in the performance of their duties, and in providing a means by which unknown witnesses may become known, is just as important for a hearing as it is for a trial.  Moreover, the hearing often is critical, and it may be decisive, in the prosecution of a criminal case.  (*See*, Justice Blackmun's dissenting opinion in a case defining the scope of the Sixth Amendment public access to suppression hearings, a 5-4 decision with three concurring opinions.  *Gannett v. DePasquale*, 443 U.S. 368, 434 (1979).

Of the Fourth, Fifth and Sixth Amendment rights applicable before trial, it appears that the Supreme Court of the United States places the Sixth Amendment, the amendment that most closely guards the reliability of evidence, at the top of the hierarchy.  *See*, Charles H. Whitebread, *The Burger Court's Counter-Revolution in Criminal Procedure:  The Recent Criminal Decisions of the United States Supreme Court*, 24 Washburn L.J. 471, 478-84 (1985).  When Sixth Amendment concerns are considered, notions of fair play and due process are at issue.

*Crawford  v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004) transformed the doctrine of the Confrontation Clause of the Sixth Amendment.  The Court noted that even though the Confrontation Clause does not "…command[] …that evidence be reliable," its "… ultimate goal is to ensure reliability of evidence," and to achieve that objective, it requires "… that reliability be assessed in a particular manner:  by testing in the crucible of cross-examination."  124 S. Ct.,

at 1370.  While *Crawford* leaves unresolved the standards that govern the adequacy of a pretrial

opportunity for cross-examination, defendant argues that an opportunity to be face-to-face with

an accuser/witness is at least presumptively required to satisfy the Confrontation Clause.  The

*Crawford* case has given new life to the right to confrontation, and that right should be

applicable to all critical stages of a criminal case, including preliminary hearings.  It is noted that

only a few years ago, many federal courts declined to apply *Crawford* and permitted hearsay

crime laboratory analyst evidence, thereby violating the right to confrontation, until the Supreme

Court issued its ruling in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009).  Due process in

the criminal process must be interpreted to guarantee more than the right to a fair trial. This is

especially so because the vast majority of criminal cases never make it to trial; they are resolved

through plea negotiations, and defendants, therefore, are entitled to pretrial procedures that

protect the fairness and the integrity of the process which overwhelming leads to conviction by

plea.

  Applying Sixth Amendment due process to a *Starks* hearing is not unprecedented in the

Third Circuit.  *United States v. Cianfrani, Appeal of Intervenors Philadelphia Newpaper, Inc.,

Jan Schaffer and James Smith*, 573 F.2d 835 (3d Cir. 1978) involved the Sixth Amendment's

public trial provision.  In that case, the defendant, a powerful politician, sought to exclude the

public from his *Starks* hearing relating to issues of consensual recordings.  The trial judge

excluded the public.  By the time that the Third Circuit decided an expedited appeal, the *Starks*

hearing had been had, the defendant had entered a guilty plea and the transcript of the hearing

was sealed.  The Court of Appeals found that the public's right to a public trial applied to

hearings, that the public had been excluded from the hearing erroneously and also ordered the

unsealing of the transcript, stating:

> We thus believe it was error for the district court to have excluded the public from any more of the pretrial suppression and Starks hearing than reasonably would have been necessary to protect against disclosure of the contents of the communications at issue, or any evidence derived therefrom, prior to the district court's decision to grant the government's Starks motion.

The *Cianfrani* case relied heavily on *Bennett v. Rundle*, 410 F.2d 599 (3d Cir. 1969) (in banc). *Bennett* involved a challenge to his conviction by a defendant who assigned as error the exclusion of the public, pursuant to a state court rule, from a suppression hearing into the voluntariness of the defendant's confession held in accordance with *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774 (1964).  The Court noted how a *Jackson v. Denno* hearing differed from a full trial—it was a preliminary proceeding to determine the admissibility of evidence, not an inquiry into guilt or innocence.  However, the Court found that the *Jackson* suppression hearing "differ[ed] strongly from those incidental or collateral discussions outside the presence of the jury," such as side bar conferences or conferences in chambers. The Court found that the *Jackson* hearing "had more of the characteristics of a testimonial hearing, which is the essence of a trial proceeding," in that witnesses were sworn, were subject to cross-examination, credibility was in issue and there was strong pressure on each side.  *Bennett*, at 605.  Accordingly, the Third Circuit, sitting *in banc*, found the *Jackson* hearing to be subject to the Sixth Amendment's public trial provision.  In light of *Crawford*, these decisions take on more importance and must be revisited.

The defendant argues that his Sixth Amendment right to confront witnesses against him applies to the *Starks* hearing held herein and that he should have been allowed to confront EGOROV by cross-examination on *all* relevant issues.  Without such confrontation, the recordings should be deemed inadmissible..

Once (and, admittedly, if) the defendant is past the issue of applicability of the Sixth Amendment to a *Starks* hearing, it becomes appropriate to conduct a Crawford analysis.  The lynchpin of *Crawford* is the distinction between testimonial and nontestimonial hearsay. While Justice Scalia, writing for the Court, expressly declined to provide a comprehensive definition of "testimonial statements," he did provide benchmarks through examples:

> Various formulations of this core class of testimonial statements exist:  ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements… contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.  These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it.  *Crawford*, at 51-52.

The *Crawford* Court stated further, however, that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U.S., at 59, n. 9.  As a result prosecutors have proffered and various courts have accepted, testimonial hearsay statements into evidence on the basis that they are not being offered for the truth of the matter asserted.  For example, the declarant's statements may provide context to or for a defendant's statements and, therefore, are not being used for the truth of the matter asserted therein.

The most recent case in this circuit interpreting the *Crawford* decision and its three-case progeny is *United States v. Berrios*, 676 F.3d 118 (3d Cir. 2012), wherein it was stated that *Crawford* established a *per se* rule where testimonial hearsay is concerned and the declarant is absent and, further, that "the Confrontation Clause protects the defendant only against the introduction of testimonial hearsay statements." (*Id.*, at 126), citing *Michigan v. Bryant*, 131 S. Ct. 1143, 1152-53; *Whorton v. Bockting*, 549 U.S. 406, 419-20; and *Davis v. Washington*, 547

U.S. 813, 823-24 (2006).  *Berrios* set out a twofold inquiry with regard to the Confrontation Clause.  First, a court should determine whether the contested statement by an out-of-court declarant qualifies as testimonial under *Davis* and its progeny.  Second, the court should apply the appropriate safeguard.  If the absent witness's statement is testimonial, then the Confrontation Clause requires that the witness be unavailable and no prior opportunity for cross-examination of the witness.  (Citing Crawford, 541 U.S., at 68).  If the statement is nontestimonial, then admissibility is governed solely by the rules of evidence.  (Citing Davis, 547 U.S., at 823).  *Berrios*, at 128.

*Berrios* involved a prison yard recreational area recording made of two inmates, Berrios and another person, in accordance with a Title III surveillance application and order.  The inmates, in conversation, implicated a third person in a crime in which the inmates were involved.  Applying the two-part test to the Title III recording, the Court found that the recorded conversation was nontestimonial, reasoning that the contested statements bore none of the characteristics that would indicate they were testimonial.  More specifically, there was no indication that the inmates or either of them held the objective of incriminating anyone when they were recorded, there was no indication that the inmates were aware that they were being overheard, and there was no indication that the inmates' conversation consisted of anything but casual remarks.  The Court did make clear, however, (at footnote 5) that:

> Of course, it is possible that participants in a recorded conversation might be aware that they are being recorded and intentionally incriminate another individual.  By no means are we establishing a categorical rule:  simply because we have found *some* Title III recordings to be nontestimonial does not mean that *no* Title III recordings can qualify as such.  Rather, each statement should be scrutinized on its own terms to determine whether it exhibits the characteristics of a testimonial statement… There may be some instances, such as where the primary purpose of the declarant's interlocutor was to elicit a testimonial statement, such that even if the declarant's purpose was innocent, the conversation as a whole would be testimonial.

Let us scrutinize what happened in the instant case and review some of the relevant facts. When EGOROV agreed to cooperate with the government, he knew that he was being asked to make cases—and that is what he attempted to do. This would naturally involve testimony at trial, if a case went to trial. In fact, EGOROV's Guilty Plea Agreement included such. More specifically, when he "consented" to record in-person and telephone conversations relating to the instant case, EGOROV knew that the recordings would be used prosecutorially and that they would be used at a trial of the case. That was the purpose for making the recordings, and it cannot be denied. Reading the transcripts leads inexorably to the conclusion that EGOROV's goal was to induce the defendant to make incriminating remarks and to record them. The recorded statements of the declarant are clearly testimonial.

In addition, with regard to the recordings—specifically EGOROV's statements therein, it cannot reasonably be claimed that they are not hearsay. They are definitely being offered for the truth of the matters asserted. A review of the transcripts of this case shows that EGOROV does approximately eighty (80%) percent of the talking. Virtually all of the words that can be said to be of an inculpatory or incriminating nature come from his mouth. And, as ZUCHMAN agreed during cross-examination, most of what EGOROV says to ASTAKHOV is in the form of questions. EGOROV became an interrogator of ASTAKHOV, and since he was guided by ZUCHMAN with respect to what he should talk about in the conversations, EGOROV became the alter ego of ZUCHMAN. (Tr,. At 44-46). EGOROV so dominated the conversations that a jury will take his recorded statements as being offered for the truth of the matters asserted, they could not help but to do so, and no instruction by a court can change that. Further, EGOROV's dominance in the conversations (that is, the way he took over the conversation, his interrogating technique, his cutting off of ASTAKHOV before he could finish sentences, his use of

24

inculpatory words and phrases, his changing of topics and, generally, his directing the path of the conversations) is such that his statements could not be said to be offered to put the statements of ASTAKHOV into context or to aid the jury by adding context to ASTAKHOV's statements.

## CONCLUSION

For all of the reasons set forth herein, the defendant respectfully requests that the government's *Starks* motion be denied in all respects and that all of the recorded conversations be found to be inadmissible as evidence.

Respectfully submitted,

THE PASCARELLA LAW FORM

By: __/s/ James A. Pascarella_____
JAMES A. PASCARELLA
Signature Code:  JP4952
(Counsel for the Defendant)